Page number 142380, Gene v. Lynch. Aha. Whenever you're ready.  Good morning, Your Honors, and may it please the Court. My name is Tamara Jezik, and I represent Mr. Oxygen in his petitions for review of two decisions of the Board of Immigration Appeals. First, the decision dismissing Mr. Oxygen's appeal from the immigration judge's order, and the second decision was the Board's denial of Mr. Oxygen's motion to reopen. Now there are two separate and independent grounds for the Court to find that the BIA committed legal error in both decisions. First, in the dismissal of the appeal, the Board held Mr. Oxygen to the incorrect legal standard announced in the 2002 decision of the Board of Immigration Appeals in RAE-JE, which was largely based on the Board's narrow and unreasonable interpretation of the term's specific intent. I'm sorry, unreasonable? Unreasonable. Why don't we defer to that? Every other court that's had this, or just about every other court has. I'm not sure if that's whether or not it is, and you can go through them if you want to. I think it is fair to say that most circuit courts have deferred. Why should they? Yes, Your Honor. There are a few reasons. First of all, congressional intent in implementing the Convention Against Torture is unambiguous. Congress enacted the FARA, the Foreign Affairs Reform and Restructuring Act, to implement Article III of the Convention Against Torture. And in the FARA, the Congress directed agencies to promulgate regulations to implement the obligations of the United States under Article III of the CAT, subject to any reservations or understandings contained in the Senate Resolution of Ratification of the Convention. The Congress did not give to the Board of Immigration Appeals discretion on how to define specific intent. In FARA, Congress told the agencies, both the Department of Justice and the State Department, to implement Article III of the CAT using the definition of the CAT, subject to the understandings contained in the Senate Ratification of the Convention. And that meant that in the definition of torture, pain and suffering was specifically intended, as opposed to pain and suffering that was unintended. We can ascertain congressional intent, legislative intent, by looking at the ratification history, as well as the wording of the CAT, as well as the implementing regulations in the FARA. In ratifying the Convention Against Torture, the Senate Foreign Relations Committee was concerned about acts resulting in unintended or unanticipated consequences, and resolved that concern by incorporating a specific intent requirement. The Senate Committee on Foreign Relations wrote in its report concerning ratification of the CAT in 1990, because specific intent is required, an act that results in unanticipated and unintended severity of pain and suffering is not torture for purposes of the Convention. And that was incorporated into the regulations that state, in order to constitute torture, an act must be specifically intended to inflict severe or mental pain and suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture. Mr. Oxygen agrees that there is a specific intent requirement in the definition of torture. Mr. Oxygen contends that in the context of deferral of removal under CAT, specific intent is satisfied when the prospective torturer takes an action, either desiring that his action cause severe mental or physical pain or suffering, or knowing that the natural and probable consequences of that action is to cause severe mental or physical pain or suffering. And this interpretation of specific intent is consistent with the Supreme Court precedent, including U.S. v. U.S. Gibson Company, Tyson v. Arizona, and the Fourth Circuit case of U.S. v. Nieswender. We can also look to the plain language of the regulations and of the CAT. Both the terms intent and purpose are used in the definition of torture. That's in Article I of the CAT and 8 CFR, Section 208.18. The definition of torture, as incorporated into U.S. law by the regulations, state any act by which severe pain and suffering, whether physical or mental, is intentionally inflicted on a person for a proscribed purpose, such as one of the purposes listed in 8 CFR, Section 208.18a. And we know from this Court's case in Solomon v. Gonzalez, where Congress uses distinct terms within the same statute, basic principles of statutory construction require that we endeavor to give different meanings to those different terms. Here, the different terms are intent and purpose. The BIA is holding that in order to hold that the intentional detention of criminal deportees to Haiti is not torture unless the applicant can prove that patient authorities intentionally created and deliberately maintained these conditions is a purpose argument when the definition of torture requires the intent, specific intent. Also, the interpretation of specific intent is one that does not lie within the BIA's authority or expertise. It's a criminal term of art that this Court and other courts are just as well or perhaps better suited to interpret than the BIA. And the decision is not well-reasoned. It only cites to Black's Law Dictionary, ignoring criminal jurisprudence interpreting specific intent more broadly and not citing to a single case. For those reasons, Your Honor, we urge the Court to hold that in the context of deferral of removal, specific intent can be satisfied when the torturer takes an action knowing that the natural and probable consequences of that action or knowing that the substantial suffering. Now, the second error on the part of the Board, both in the dismissal of the appeal and in the denial of the motion to reopen, is that the Board committed legal error by ignoring unrebutted, legally significant evidence in dismissing Mr. Oxygen's appeal and in denying his motion to reopen. And this is an error of law in the context of CAT, because the domestic law implementing the Convention Against Torture requires the fact finder to consider all evidence relating to a CAT claim. That's in 8 CFR Section 208.16C3, and this Court told us in Kammerer v. Ashcroft that where the immigration judge failed to follow the regulations by considering all evidence related to the possibility of future torture, this Court reversed and remanded. In the dismissal of Mr. Oxygen's appeal, the BIA and the immigration judge recited practically the same language of enrage I.E. in dismissing the application for relief. Both the immigration judge and the Board failed to provide a reasoned explanation as to why the facts of Mr. Oxygen's case did not qualify him for relief under CAT. And on that ground alone, this Court should remand to the Board. The Board also ignored unrebutted, legally significant evidence. There were four State Department reports in the record. The State Department report from 2000, as well as the State Department reports from 2011 to 2013. And neither the immigration judge nor the Board even mentioned the State Department reports in their opinions. And those reports provided evidence that the deplorable conditions are not just what the Board said they were in enrage I.E. In enrage I.E. in 2002, the Board said that the deplorable prison conditions were the result of budgetary and management problems, as well as the country's severe economic difficulties. The more recent State Department reports provide evidence that the deplorable prison conditions are largely the result of police and judicial corruption. For example... I thought the more recent reports were more equivocal about whether these conditions continued, some of these conditions continued to exist. You don't read them that way? I don't, Your Honor. Okay, you think that they're worse than the earlier report. Is that what you're putting? Yes, Your Honor. And I think that there's more evidence that these conditions are not just the result of the fact that Haiti is an extremely poor country. For example, the 2013 reports from the State Department, if you look to page 180 of the record, the most serious impediments to human rights included deficient judicial system and chronic corruption in all branches of government. Basic human rights problems included overcrowded and poor sanitation in prisons and if you look to pages 191 to 193, there's a lot of detail about judicial corruption, prolonged pretrial detention, and denial of a fair trial. For example, there were over 10,000 prison inmates and authorities held approximately 73 percent in pretrial inmates. On page 207 of the record, the State Department states that there were frequent reports of corruption in the Haitian Police Department. For example, affluent prisoners at times obtained favorable conditions of detention. So there's evidence in the State Department report that the IJ and the BIA ignored that Haiti's deplorable prison conditions are largely the result of judicial and police corruption rather than just the severe economic problems. The Board also failed to consider evidence in the motion to reopen and the Board does have jurisdiction to review questions of law in the motion to reopen and Mr. Oxygen contends that the Board committed legal error by ignoring legally significant unrebutted evidence in the motion to reopen. In the motion to reopen, Mr. Oxygen claimed he would be singled out by prison officials upon his detention in Haiti because of his mental illness and Mr. Oxygen submitted evidence that after the merits hearing, he was diagnosed with post-traumatic stress disorder and depression and also in April 2014, he was placed under suicide watch in Haiti. The Board denied the motion to reopen in one paragraph and that paragraph demonstrates that the Board failed to consider all of the evidence. For example, the Board stated he claims he will suffer harm if he is returned to his native country, Haiti, due to his mental condition. The evidence before us shows that people in Haiti with mental disabilities may face social stigma and lack of resources. The one paragraph decision denying the motion to reopen does not even mention the detention of criminal deportees upon their arrival to Haiti. The denial of the motion to reopen does not mention any State Department reports. The denial of the motion to reopen does not demonstrate that the Board considered Mr. Oxygen's mental illness in light of his diagnosis also of tuberculosis. It did not consider evidence in the record that people in Haiti attribute mental illness to supernatural causes and believe that mental illness is contagious. And that the other submission on page 324 of the record that mentally ill deportees are often mistreated and are at an increased risk of police brutality and do not have a supply of medicine. And we urge the Court to reverse the Board on its denial of motion to reopen because the Board committed legal error in failing to consider all evidence before the Board. Going back, Your Honor, to the question about the circuit courts. The Eighth Circuit and the Ninth Circuit, I think, have, I'm sorry, the Ninth Circuit and the Eleventh Circuit have decisions that are favorable to our interpretation of specific intent. They don't refer to Henry, J.E.? They do. The Eleventh Circuit, I'm sorry? Exactly. That was my question to you. Yes. And most of the circuits defer to it. Oh, defer. And you said no. Defer. Your Honor, I misunderstood your question. I heard refer. So, yes, but in a limited way. For example, the Ninth Circuit defers to the holding in Henry, J.E. that we have deferred to the BIA's conclusion that detention of criminal deportees alone is not sufficient to constitute torture where there is no evidence of specific intent to inflict pain or suffering. Well, that is a correct statement of the law. So, we have that holding here? Yes. The Ninth Circuit. But the Ninth Circuit, when making its ruling, had a record before. Do we have the same record here? Oh. No. No. But the Ninth Circuit's deferral to the BIA is the holding that detention of criminal deportees alone is not sufficient to constitute torture. We don't contest that where there is no evidence of specific intent to inflict severe pain or suffering. Was the administrative decision in the Ninth Circuit case identical to the one here? No, Your Honor. No. So, when they're judging it, they're judging a wholly different record, right? Yes, Your Honor. The Eleventh Circuit also defers to J.E. in that it states that indefinite detention of criminal deportees by itself does not constitute torture. And that's a correct statement of the law as well, Your Honor. The Third Circuit does defer to N. Ray J.E., but it does leave room for petitioner's interpretation. And that is in Pierre v. Gonzalez, 502 F. 3rd 109, footnote 6, that states, that a particular course of action is taken with specific intent to inflict severe pain and suffering if it is found on the record evidence that the actor is aware of a virtual certainty that such pain and suffering will result. And was that the finding that was made here? No, Your Honor. It was not the finding. I don't understand how that necessarily helped you. I mean, we could accept that. We could agree with the Third Circuit on that. But that isn't the record that's in front? Your Honor, the immigration judge, my time is up, but I can answer. The immigration judge did not make the factual finding or did not look into whether Mr. Oxygen had established specific intent to inflict severe pain or suffering because the immigration judge said that N. Ray J.E. dictates this case. Well, I guess we can read it in all kinds of ways. But if the facts here were virtually identical in all important respects to N. Ray J.E., that would be correct. It would be correct with respect to what the Third Circuit said, too. You have to have different findings to come out a different way than N. Ray J.E., don't you? I mean, I thought that was even your submission. You have to have different findings. Or are you suggesting that we just reject? I didn't know. I had gathered that you didn't say that we would just out and out reject N. Ray J.E. Is that your submission? Yes, Your Honor, that the N. Ray J.E.'s definition that specific intent is only satisfied when Haitian authorities We should, on our own, decide that that's wrong and set forth a new standard. That's your submission. Your Honor, I do believe that the court can do that. I'm not asking whether we can. I'm asking whether you think that we should. Yes, Your Honor, I think that the interpretation of the Third Circuit That's what you want us to do. That's right. I thought you had a more modest position, which is assume N. Ray J.E. is correct, that you would still win. That's our second argument, Your Honor. The first argument is that the standard articulated in N. Ray J.E. is incorrect. That the court should establish a more correct interpretation of specific intent. And all the Supreme Court teachings about deference, we should ignore. Your Honor, it is our position that the N. Ray J.E. definition or interpretation of specific intent is not entitled to deference. Any deference.  I approve the court. I'm Jeffrey Lee. I'm appearing on behalf of the Attorney General. The court should defer to the board's interpretation of the specific intent standard in N. Ray J.E. As the court is aware Can I ask you at the outset? Yes. You spend so much time in your papers about jurisdiction. Is it your claim that the I.J. and the B.I.A. applied an incorrect legal standard in this case? That that is a question over which we do not have jurisdiction? No, that's incorrect, Your Honor. The brief says that. Isn't that what we're here about? Yes, Your Honor. So it seems to me we quintessentially do have jurisdiction over that question. Over that issue, yes, Your Honor. That's the government does concede that the court has jurisdiction to review whether or not the standards at 4th and J.E. is correct. So assuming we defer to the B.I.A., what is the what degree of deference do we give? That's a good question, Your Honor. You got the answer there, right? Well, it's. You have a good answer? We argue for Chevron deference in our brief. The courts of appeals that have looked at the issue have kind of always deferred to the board's determination. But their deference has either been not explicit or is buried. The 8th Circuit finds it doesn't even have to get to the issue of deference because of a plain reading of the regulation supports the board's finding. The 3rd Circuit found that an even greater amount of deference was due than is typically given to the B.I.A. because it was not simply the board interpreting a regulation on its own, but it was actually doing so at the behest of the president who had the understanding with the CAT to the Senate, to Congress, through the D.O.J., and then it was the board interpreting it finally. Right. I understand that different courts have done different things. I'm asking you what the United States of America believes the degree of deference is. I think that Chevron would be appropriate or our deference would be appropriate. Which one? Chevron or our, A-U-E-R. Which one? I would say that because this deals with the regulation itself, even though it's kind of got the backing of everything else, that ours directly addresses the issue of regulations and the deference given to the board's interpretation of its own regulations. So you've given up on Chevron deference? Well, I mean, we argued for Chevron in our brief. It is kind of an interesting issue, and the 3rd Circuit. But you want our deference? At the very least, our deference. At the very least. Yes. Chevron may be appropriate. The 3rd has given Chevron. I believe the 9th and the 11th have given Chevron. And this J.E. is an in-bank decision? Yes. How often does a board meet in-bank? That I don't know. How many judges on the board, or how many board members? There's 15 board members. How many? Fifteen. Fifteen? And the in-bank proceeding would have all 15 of them, like in this courtroom? I believe so. Here in the case? I believe so. It doesn't happen very often? Not that I'm aware of. Is it like a rehearing? I'm not sure if it's like a secondary process or if it can be somehow. Do they have to do that in order to change a ruling by a panel? A three-board panel? Three-member panel? I don't know off the top of my head. You don't know the rules? I just don't know what the process for an on-bank decision vis-à-vis a three-panel decision is. Was it similar to what the courts of appeals do? I mean, we've got in-bank rules. Right. We don't do it very often, but you know it's a major case? Yeah, I'm not sure if it's something that is set at the outset, that the board decides on its own it's going to do something. I'm not sure if it's something that the AG refers to. You don't know why this one went in-bank? I don't know, Your Honor. Okay. Where are you stationed? Are you in Maine Justice? We work for Justice. We're not in Maine Justice. You're not on the brief, right? No, I did not write the brief. So what I'm trying to do is, if you did write the brief, what would you put down as your address? Would it be in U.S. Department of Justice? Would it be Office of Immigration Litigation? Where would you be? We would be the Civil Division of the Office of Immigration Litigation, part of the U.S. Department of Justice. Okay. So I would think you would know these things, you know, like the underlying facts. I mean, you know, you certainly are closer to the ground than we are, right? True, Your Honor. I mean, I didn't anticipate that being something that was going to pique the court's interest. It wasn't addressed at any of the pleadings or anything like that. So I apologize. The fact that this is an unbanked decision is certainly part of this case, right? Sure. And we don't know. Indeed, we think, perhaps from other cases, that this board can reverse itself by less than one three-judge panel can reverse another three-judge panel. But we don't know that, and that's what we're sort of probing. If you would like for me to do some supplement or provide the court with some supplemental information, I would be glad to do so. Yeah, I was going to ask if the in-bank decision is entitled to more deference than a panel decision. I would think so, because it's an unbanked decision. What do you do if you have two panel decisions that are in conflict? That's a good question, Your Honor. Well, it is a good question, but then you're the man to answer it. Because you're here for the Attorney General of the United States. Correct. I believe it. Honestly, I don't know, Your Honor. I don't know if it has to go back to unbanking that. I would think that it does not. Well, in our court, the earlier of the two decisions controls. The second decision, in time, that's contrary to the earlier decision and inconsistent, would not control, because the prior panel is the precedent, and the second court just missed it. Correct. Simply missed the precedent. That's the way the Fourth Circuit works. But actually, other circuits do it, too. And I was going to try to get at whether that was the way this outfit worked. But anyway, the board. We have 15 judges, too, and we're just the same number. Same number. 15 judges. You've got 15 board members. And they went in bankier for this case. Do you know what the vote was? Not off the top of my head. Was it 15 to nothing, or was it 8 to 7? There was, I believe, four board members who dissented. So I would say it was 11 to 4. 11 to 4, I believe. Okay. So you would agree that there is some room, even if you apply J.E., to get relief, for the immigrant to get relief? Absolutely, Your Honor. So what would you have to do to demonstrate that? You'd have to show specific intent on the part of. . . Okay, but how would you do that? In the cases where it has been done in the Eleventh Circuit and the Ninth Circuit, the record contained evidence through expert testimony that this alien was at specific risk for harm, and that's absent from this case. I mean, it's the same thing that any alien would have to demonstrate to show relief under CAT. So tell me, what kinds of facts would demonstrate that this inmate was at specific risk for harm? Some kind of expert testimony, some kind of evidence from. . . No, no, I understand you said it was expert testimony, but what would the expert have to say? In other words, gay person? What was the gist, the underlying thing, fact, that made this person particularly at risk for harm? In the Eleventh Circuit, it was the specific evidence that because of his condition, he would be placed in a crawl space and beaten severely and things like that. Because of his condition? What condition? I don't recall what the condition was off the top of my head. So, I mean, if you have specific evidence from an expert or other evidence like that that shows that someone has evidence. . . If you have evidence from the authorities themselves stating things on the record and things of that nature, I mean, it's the same standard that any alien who's seeking CAT relief would have to show, that there's a specific intent, whether it's by the officials, whether it's by private actors, whether there's acquiescence, all things like that. In an ordinary criminal case, the district judge will instruct the jury that if somebody had knowledge that something will happen, that that's sufficient to show specific intent. And I think that's the gist of their argument here. Why doesn't that same argument apply? Well, the courts that have looked at the issue have all found that foreseeability is not sufficient to meet the specific intent standard. That even in the Third Circuit, I believe it was Pierre, found that even with something was practically certain to occur, that it was still not sufficient. That you still had to show specific intent. Why is it sort of a matter of law, you know, if we're thinking of the system, why should it be enough to get you jailed for a crime, but not enough to get relief under this statute? I think they're separate issues, Your Honor. They're separate issues. Because there's protections for aliens, not for aliens, for criminals under the U.S. jurisprudence that's separate from an alien seeking relief from a foreign actor. So I think that, you know, even though some courts have addressed specific intent with a knowledge requirement, the courts that have looked at it in the context of CAT have found that foreseeability, willful blindness, things of that nature, are insufficient to show the actual specific intent. They've shown that it actually has to be an intent on the part of the prospective torturer to actually engage in an act that will result in severe pain and suffering. And that would be the jailer down in Haiti? Yes. And the evidence that we have in the record here is simply that it's not an intent. The system is not being created and maintained in a way to inflict pain and suffering on people for that intent. It's simply it's overcrowding, it's lack of resources. The most recent State Department report, the 2013 report, actually shows that conditions have been, if not getting better, that there's an attempt being made to make them better. There's a section in there about improvement. I thought that was so too, but your colleague said that's untrue. I mean, it's in the record, Your Honor. It's at page 185 of the record and 187 of the record. 185 discusses that there's NGOs that are given free reign within the prisons to actually ameliorate some of the medical conditions. 187 through 88 discusses improvements, remodeling of prisons, building new prisons, providing better hygiene tools and things of that nature.  Whether or not, you know, attempts by the authorities, in that case it dealt with a mental hospital and the conditions for mental inmates. And it found evidence that the government had given human rights organizations free access and was taking steps to improve was evidence of a desire to improve conditions. And that undercut any claim that there was actually a specific intent to harm anybody there. I think that's kind of the situation that's from the latest State Department report in Haiti as well. Conditions are deplorable, but it's not because that they're actually doing that to torture anyone. And they're actually trying to, albeit not at a very rapid pace it would seem, to make those conditions better. Turning to the motion to reopen, the motion to reopen suffers from the same jurisdictional issues as does the merits appeal. Namely, that because this is a criminal case, only questions of law and constitutional claims are properly before the court. And the petitioner's claim is not a true constitutional, excuse me, legal claim. It's that it's an abuse of discretion claim, saying that the board didn't properly consider the evidence. There's no evidence, there's nothing in the record that shows the board did not consider the evidence. It's simply they didn't find it persuasive. I think it's important that the board's under no obligation to give more robust treatment to an issue than an alien actually does themselves. And the motion to reopen was based on the recent mental health diagnosis. That issue was first broached in the merits appeal where the petitioner argued that there's a document in the record that shows that, you know, as the opposing counsel mentioned, that people in Haiti in general think that there are supernatural causes for it and that it can be transmittable. Well, the motion to reopen, the claim is limited to a sentence that says he'll be targeted due to his mental illness, but he only supports that with the 2012 Human Rights Report, which says that people with mental illness are marginalized, neglected, and abused in society. That doesn't actually go to the specific issue in this case of whether it relates to prison conditions. So the fact that the petitioner themselves didn't, you know, draw the linkage between the two doesn't mean that the board somehow would fall for failing to do that as well. If there are no further questions. I don't think we have any more questions. Thank you. Thank you very much. Thank you, Your Honor. The situation in the 11th Circuit that distinguished the petitioner in that case was that the petitioner had HIV and mental illness, which was similar to Mr. Oxygen's claim. He has tuberculosis, although it was latent in the United States, and he has mental illness. And the mental illness diagnosis was not discovered until after the merits hearing, which was why the evidence was not before the board in the original appeal. In the motion to reopen, Mr. Oxygen's attorney submitted medical records that Mr. Oxygen had been diagnosed with depression, PTSD, and that he had been placed on suicide watch. And the question presented in the motion to reopen is a question of law. We're not asking that the court reweigh the evidence, but that the court hold that the BIA did not properly consider the evidence. And to not properly consider, to not consider all of the evidence in a cat claim is an error of law. How do we know that the agency didn't consider all the evidence? How do we know? Because of the wording of the decision. I'm not familiar, excuse me, with any principle of law that says that the deciding authority must set forth and address every argument made or all facts in the case in rendering its decision. We all the time are affirming cases in which that hasn't happened. That's correct, Your Honor. So what's the deficiency here that raises a matter of law? The failure to consider evidence of Mr. Oxygen's mental illness in light of every other, all of the other evidence in the record. The agency did not even mention the fact or the allegation, the claim that Mr. Oxygen would be placed in deplorable prison conditions upon his arrival to Haiti. And so it was an error of law not to consider Mr. Oxygen's mental health diagnosis in light of all of the other. I just agreed about, I don't know, a minute and a half ago, that the deciding authority doesn't have to state every, the basis, it doesn't have to discuss each fact or to discuss every basis for its decision. That's correct, Your Honor. But I think that the way that the word, this decision is worded in one paragraph dismissing the new evidence. I thought it was two paragraphs. I'm mistaken then. The heart of the, the court does not address the heart of Mr. Oxygen's claim that because of his mental illness, he will be subjected to even more harsh treatment in Haitian prisons. Because of the way that the court analyzed the questions, it demonstrated that it did not consider the heart of his claim, and that is a violation of U.S. law implementing the Convention Against Torture. Thank you, Your Honor. Thank you for your time, and we urge the court to reverse the board and demand the case to the Board of Appeals. Thank you. We will come down and greet the lawyers and then take a brief recess. This honorable court will take a brief recess.
judges: Diana Gribbon Motz, Robert B. King, Barbara Milano Keenan